1

2

3

4

5          **IN THE UNITED STATES DISTRICT COURT**

6          **FOR THE EASTERN DISTRICT OF CALIFORNIA**

7
   MARLENE ROCK,                    )          Case No. 07-cv-00065-TAG
8                                    )
                   Plaintiff,        )          MEMORANDUM DECISION
9                                    )          AND ORDER ON APPEAL FROM
         vs.                         )          ADMINISTRATIVE DECISION
10                                   )
   MICHAEL J. ASTRUE,[1]            )          ORDER REMANDING THE CASE
11  Commissioner of Social Security, )          PURSUANT TO SENTENCE FOUR OF
                                     )          42 U.S.C. § 405(g)
12                 Defendant.        )
                                     )          ORDER DIRECTING CLERK OF COURT
13  _____   )          TO ENTER JUDGMENT

14          Plaintiff Marlene Rock ("Rock") filed an application for disability insurance benefits under

15  Title II of the Social Security Act ("the Act").  Rock's application was denied.  Pending before the

16  Court is Rock's appeal from the administrative decision of the Commissioner of Social Security

17  ("Commissioner").  (Doc. 7.)  The matter has been fully briefed. [2] (*See* Docket Sheet).

18                          **PROCEDURAL HISTORY**

19          Rock filed an application for Disability Insurance Benefits on September 21, 2001, alleging

20  disability because of severe back pain and bowel resection surgery.[3]  She claimed an onset date of

21

22  _____

23          [1] Michael J. Astrue is substituted for his predecessor, Jo Anne B. Barnhart, as Commissioner of the Social
    Security Administration. 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d)(1).

24          [2] The Clerk of Court erroneously docketed the Commissioner's responsive brief as a motion for summary
    judgment.  Although  briefs in Social  Security cases previously were deemed summary judgment motions, for several
25  years this Court  has termed the documents as "opening briefs," "responses," or "oppositions" and "reply briefs".  This
    memorandum opinion and order continues that trend.
26
            [3] The bowel resection surgery occurred after December 31, 1999 and resulted from lupus-related complications.
27  The ALJ found that Rock had no symptoms of systemic lupus erythematosus  prior to December 31, 1999, the date Rock
    last met the insured status requirements of the Act.  (AR 20-22.)
28

                                            1

September 24, 1994, which was later amended to November 20, 1996.  After her application was denied both initially and upon reconsideration, Rock requested a hearing before an administrative law judge ("ALJ").  On September 25, 2002, ALJ Rocklyn Lyons conducted a hearing to consider Rock's  application.  Rock was assisted at that hearing – and throughout these proceedings at the administrative level – by a non-attorney representative.  ALJ Lyons denied Rock's application for disability insurance benefits on November 7, 2002, but the Appeals Council subsequently vacated that decision and ordered the matter remanded to the ALJ for resolution of various issues.  (Administrative Record ("AR") 408- 409).

Following the remand, ALJ James Ross was assigned to adjudicate this matter.  On June 15, 2004, he conducted a hearing on Rock's application and, on July 21, 2004,  issued a decision denying her application.  (AR 433).  Rock requested that the Appeals Council review ALJ Ross's decision (AR 440), which it did, and which resulted in an order remanding the case to the ALJ on March 15, 2005.  (AR 443-445).  In its remand order, the Appeals Council directed the ALJ to consider several issues, including the credibility of Rock's allegations regarding the limitations resulting from her claimed impairments.  The Appeals Council also directed the ALJ to offer Rock the opportunity for a hearing and to issue a new decision in this matter.

The third and final administrative hearing was conducted by ALJ Ross on May 18, 2006.  After taking testimony from a vocational expert and denying Rock's request to testify on matters regarding the credibility of her symptoms, the matter was submitted.  On July 27, 2006, ALJ Ross again concluded that Rock was not disabled as of the date she was last insured under the Act and issued a decision accordingly.  (AR 14-27).  Rock again requested that the Appeals Council review the ALJ's decision.  (AR 13).  This time, the Appeals Council declined to do so.  By notice dated November 14, 2006, the Appeals Council advised Rock that it had found no reason to review the ALJ's decision, and that the ALJ's decision therefore became the final decision of the Commissioner.  (AR  9).  On January 10, 2007, Rock filed the instant action for judicial review pursuant to 42 U.S.C. § 405(g) of the United States Code.  (Doc. 1).  On January 26, 2007, she filed an amended complaint   (Doc. 7).

///

## SCOPE AND STANDARD OF REVIEW

Congress has provided a limited scope of judicial review of a Commissioner's decision to deny benefits under the Social Security Act. *See* 42 U.S.C. § 405(g). A court must uphold the Commissioner's decision when the determination is not based on legal error and is supported by substantial evidence. *See Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985); *Sanchez v. Secretary of Health & Human Services* , 812 F.2d 509, 510 (9th Cir. 1987). "The [Commissioner's] determination that a claimant is not disabled will be upheld if the findings of fact are supported by substantial evidence." *Delgado v. Heckler*, 722 F.2d 570, 572 (9th Cir. 1983) (citing 42 U.S. C. § 405(g)). Substantial evidence is more than a mere scintilla, *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975), but less than a preponderance. *McAllister v. Sullivan,* 888 F.2d 559, 601-602 (9th Cir. 1989); *Desrosiers v. Secretary of Health & Human Services*, 846 F.2d 573, 576 (9th Cir. 1988.) Substantial evidence "means such evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citations omitted). "[S]uch inferences and conclusions as the [Commissioner] may reasonably draw from the evidence" will also be upheld. *Mark v. Celebrezze*, 348 F.2d 289, 293 (9th Cir. 1965). On review, the court considers the record as a whole, not just the evidence supporting the decision of the Commissioner. *Weetman v. Sullivan*, 877 F.2d 20, 22 (9th Cir. 1989) (quoting *Kornock v. Harris*, 648 F.2d 525, 526 (9th Cir. 1980)).

It is the role of the trier of fact, not the court, to resolve conflicts in the evidence. *Richardson*, 402 U.S. at p. 400. If the evidence supports more than one rational interpretation, the court must uphold the Commissioner's decision. *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984). Moreover, if there is substantial evidence to support the administrative findings, or if there is conflicting evidence that will support a finding of either disability or non-disability, the finding of the Commissioner is conclusive. *Sprague v. Bowen*, 812 F.2d 1226, 1229-1230 (9th Cir. 1987). Nevertheless, a decision supported by substantial evidence will still be set aside if the proper legal standards were not applied in weighing the evidence and making the decision. *Brawner v. Secretary of Health & Human Services*, 839 F.2d 432, 433 (9th Cir. 1987).

///

## RELEVANT LEGAL AND REGULATORY FRAMEWORK

Disability insurance benefits under Title II of the Act are available to individuals who have worked in recent years and who are determined to be disabled due to a physical and/or mental impairment. 42 U.S.C. §§ 401 *et seq.* In order to qualify, the person seeking disability benefits must demonstrate that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The Act also provides that a claimant shall be determined to be under a disability only if his impairments are of such severity that he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

To be eligible for benefits for disability insurance benefits, a worker must, among other things, be insured for disability purposes and be disabled on that date. 42 U.S.C. § 416(i). 20 C.F.R. § 404.101(a) provides, in pertinent part, that an applicant's "insured status" is a basic factor in determining if someone is entitled to disability insurance benefits and that if the person seeking those benefits is neither fully nor currently insured, no benefits are payable.

The Commissioner uses a five-step sequential evaluation process for determining whether a person is disabled under Title II of the Act. 20 C.F.R. § 404.1520. Step one determines whether the claimant is engaged in substantial gainful activities. If he is, benefits are denied. If he is not, the decision maker proceeds to step two, which determines whether the claimant has a medically severe impairment or combination of impairments that meet the duration requirements, i.e., the impairment(s) are expected to result in death, or have continuously lasted or are expected to last at least twelve months. If the claimant does not have a severe impairment, a combination of impairments, or meet the duration requirement, the disability claim is denied. If the impairment is severe, the evaluation proceeds to the third step, which compares the claimant's impairment with a number of listed impairments acknowledged by the Commissioner to be so severe as to preclude substantial gainful activity. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment meets or equals one of the listed impairments and satisfies the duration requirement, the claimant is

4

conclusively presumed to be disabled.  If the impairment not, the evaluation proceeds to the fourth step, which determines whether the impairment prevents the claimant from doing work performed in the past.  If the claimant is able to perform his previous work. he is not disabled.  If the claimant cannot perform this work, the fifth and final step in the process determines whether s/he is able to perform other work in the national economy in view of his age, education and work experience.  *See Bowen v. Yuckert*, 482 U.S. 137, 107 S. Ct. 2287 (1987).

The initial burden of proof rests upon a claimant to establish that he "is entitled to the benefits claimed under the Act."  *Rhinehart v. Finch*, 438 F.2d 920, 921 (9th Cir. 1971)(citations omitted).  In terms of the five step sequential evaluation process, the Ninth Circuit has held that "[t]he burden of proof is on the claimant as to steps one to four," while at the same time noting that an ALJ's "*affirmative duty* to assist a claimant to develop the record . . . complicates the allocation of burdens" such that "the ALJ shares the burden at each step."  *Tackett v. Apfel*, 180 F.3d 1094, 1098 & n.3 (9th Cir. 1999)(italics in original).  The initial burden is met once a claimant establishes that a physical or mental impairment prevents him from engaging in his previous occupation.  The burden then shifts to the Commissioner to show (1) that the claimant can perform other substantial gainful activity and (2) that a "significant number of jobs exist in the national economy" which claimant can perform.  *Kail v. Heckler*, 722 F.2d 1496, 1498 (9th Cir. 1984).

Here, the ALJ determined that Rock last met the insured status requirements of the Act on December 31, 1999; that Rock had not engaged in substantial gainful activity from November 20, 1996, the date on which she claimed her disability began, through December 31, 1999 ; and that, as of December 31, 1999, Rock had hypertension and low back pain which were severe impairments, but that neither of them, either singly or in combination, met or medically equaled a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1 through the date last insured.  (AR 20-22).  The ALJ concluded that Rock  was not disabled because she retained the ability to perform her past relevant work as a court clerk.  (AR 26- 27).

## ISSUES

In her opening brief, Rock argues a single issue – that the ALJ failed to consider Rock's subjective symptom testimony as directed by the Appeals Council's remand order.  That failure,

Rock claims, was error. She argues that the law was not followed and the facts were not sufficient to support the ALJ's conclusions and that, as a result, the Commissioner's administrative determination must be reversed. Rock seeks an order directing immediate payment of benefits but contends that, at a minimum, the ALJ's decision must be reversed and remanded for further proceedings to correct these deficits.

## STATEMENT OF FACTS

The facts have been presented in the administrative hearing transcripts, the ALJ's various decisions, and the briefs filed in this matter. Only the facts relevant to the issues before the Court will be addressed at length here.

A.    Remand Order

In its remand order dated March 15, 2005, the Appeals Council said:

> The hearing decision indicates, finding number 5[4], that the claimant's allegations regarding her limitations are not credible but does not consider the following factors in evaluating the intensity, persistence and limiting effects of the alleged symptoms: prior work record; daily activities; the location, duration, frequency and intensity of pain or other symptoms; precipitating and aggravating factors; the type, dosage, and effectiveness and side effects of medication; and treatment other than medication.
>
> Upon remand the Administrative Law Judge will:
>
> •    If available, obtain Dr. Swamson's [*sic*] treatment notes. ...
>
> •    Further evaluate the claimant's subjective complaints and provide rationale in accordance with the disability regulations pertaining to evaluation of symptoms (20 CFR 404.1529) and Social Security Ruling 96-7p.
>
> •    Further, if necessary, obtain evidence from a medical expert to clarify the date of onset ... .
>
> In compliance with the above, the Administrative Law Judge will offer the claimant an opportunity for a hearing, address the evidence which was submitted with the request for review, take any further action needed to complete the administrative record and issue a new decision.

(AR 445).

---

[4]  "[F]inding number 5" describes a portion of the written decision issued by ALJ Ross on November 7, 2002, i.e., "The claimant's allegations regarding her limitations prior to her date last insured [i.e., December 31, 1999] are not totally credible for the reasons set forth in the body of the decision."  (AR 406.)

B.     Hearing Testimony and Related Matters

    1.     May 18, 2006 (Second) Remand Hearing

    At the May 18, 2006 hearing following remand, ALJ Ross articulated his understanding of what the Appeals Council directed him to do:

    ALJ:   The Appeals Council said we should obtain Dr. Swanson's treating records. But it's my understanding that you've not been successful with that because they don't exist?

    REP:   That's correct, Your Honor.
    ...

    ALJ: Okay.  You did obtain some kind of statement, I guess, from Dr. Swanson.

    REP:   Yes.

    ALJ:   The other thing they asked me to do is to get the medical expert's opinion, which we did by interrogatories.  And that's now in evidence as Exhibit 22.  I've considered that and I've also considered your letter of September 6, 2005.[5]  What else do you want to do today?

    REP: Well, I think we probably need to develop more of the credible testimony [*sic.*]

    ALJ: I'm not going to go back and take testimony about that period before the last insured [*sic*].  We did that already.

    REP: Okay.  Well, then I guess we would go straight to the vocational expert testimony.[6]

(AR 564-565).

    2.     Rock's Testimony at Prior Hearings[7]

    Rock testified twice in the administrative proceedings.

        a.  *September 25, 2002 Hearing*.   In the first hearing conducted by ALJ Lyons on

---

[5]  In that letter, Rock's representative, Diana Wade, states, in part: "In the last decision not only was the DLI an issue but also the claimant's credibility."  (AR 475.)

[6]  The ALJ took testimony from the vocational expert, Ken Ferra, on issues within the purview of Ferra's expertise and then closed the hearing.

[7]  Information as to this testimony is germane to the issue before this Court for several reasons.  First, ALJ Ross's statements made in connection with his decision not to allow further testimony from Rock at the May, 2006 hearing suggest that the ALJ would consider Rock's testimony heard by him at the July, 2004 hearing.  Second, Rock's testimony at the first hearing is useful in evaluating the extent to which there was compliance with at least one of the directives contained in SSR No. 96-7p.  Third, ALJ Ross had received into evidence at the May, 2006 hearing a letter from Rock's representative that directed the ALJ's attention to a conclusion reached by the ALJ Lyons at the first hearing regarding the credibility of Rock's symptomotology, a conclusion that was apparently reached after listening to her testimony.

September 25, 2002, Rock testified about her pain and other limitations resulting from her back problems. She testified that she first experienced serious back problems in 1989 or 1990 when she developed bursitis affecting her sciatic nerve. She described the bursitis as "quite severe" and stated that the discomfort radiated down her leg, sometimes both her legs. She continued to work until 1994 when she left her employment as a judicial assistant primarily because of extreme hypertension. Rock testified that she saw Dr. Head in November 1996, because the pain from her back problems had radiated into her legs and was so severe that she had difficulty standing and walking. (AR 535). Rock acknowledged that, for some period of time after that, her back condition "waxed and waned" but testified that, from November of 1996 until December of 1999, the longest time interval she experienced noticeable relief from her back pain was two to three months. (AR 536).

At this hearing, Rock also testified that she had back surgery to fuse one of her discs in January of 2002 and that the surgery had relieved the extreme pain she had been experiencing. She testified that Dr. McCabe, an orthopedic surgeon specializing in adult spinal disorders, was the first doctor who told her that she would need back surgery. (AR 212).[8] Rock testified that she had been told by other doctors "in the past" that her back problems might result in back surgery. Rock stated that around the end of December, 1999, she experienced severe problems and pain with her back. She "had reached the point where, and [she thought] this is why [she] was more willing to consider the back surgery, [she] honestly thought [she] was going to end up in a wheelchair." When asked why it took another two years before she had back surgery, if the pain was so severe she feared becoming wheelchair-bound, Rock explained, essentially, that she felt it necessary to exhaust other treatment options before deciding to schedule surgery. Back surgery would require some cessation of the anti-clotting medication Rock took to manage health risks resulting from her lupus condition in mid-2001, and she was concerned about the potential threat to her health such a discontinuation might pose. Rock tried more physical therapy, a chiropractic regimen, and a series of epidurals in late 2001, before she was persuaded that spinal surgery was her only viable option.

///

[8] From a review of the administrative record, it appears that Rock first saw Dr. McCabe in August, 2001.

At that point in the hearing, ALJ Lyons decided that additional medical expert opinion would be necessary in order to determine the question of whether Rock was disabled prior to December 31, 1999. (AR 537-538). ALJ Lyons proposed sending relevant portions of the case record to a consulting orthopedic expert and explained to Rock that he would probably include an additional note to the consulting orthopedist that "besides just the exhibits[,] ... there was credible testimony of ongoing pain throughout ... this time period." (AR 538).

        *b. June 15, 2004 Hearing.* On June 15, 2004, ALJ Ross conducted the second hearing held in this matter.[9] Rock again testified about the limitations she experienced as the result of her back problems. (AR 544). At this hearing, Rock reported that she retired from her position as a judicial assistant to a bankruptcy judge in 1994 as the result of her extremely high blood pressure. She testified that she was also having trouble with her back before she left her job in 1994. Rock was then 57 years old. (AR 553). She described her back problems at that time as pain in the sciatic nerve that went down her leg, which she later discovered resulted "from bone on bone in the vertebrae," and testified that her back problems worsened after she quit working in 1994. By the end of 1999, her back condition had gotten significantly worse. (AR 552-555). Rock testified that her ability to conduct normal tasks associated with daily living had also declined. Rock described her daily activities at this time, i.e., the end of 1999, as "very limited." "I couldn't do things in my kitchen without my husband there because I couldn't reach things in the lower cabinet and I couldn't get things out of the refrigerator that were on lower shelves. I couldn't get my shoes out of the closet. ... I couldn't do much of anything. I couldn't walk into a department store or a market without pain." (AR 555).

        Rock testified that she had back surgery only after she had tried all other options and felt she could not "go on anymore with that." (AR 547). Rock acknowledged that in the year prior to December 31, 1999, she may not have consulted with a doctor for her back problems. She testified that she had been treated by Dr. Head with physical therapy and pain medication until sometime in 1998, after which she "did nothing more through him." (AR 547-548).

---

[9] This hearing was conducted after issuance of the Appeals Council's first remand order.

Rock testified that, from January 1999 through June 2000, she had been seeing Dr. Swanson for treatment of her back condition. Dr. Swanson sent her to other providers in his clinic for massage therapy, manipulation of the vertebrae, and a nerve stimulation treatment. (AR 549). She received treatment during this period about three times per week and experienced some pain relief from the discomfort radiating down her leg. (AR 549-550).

In December of 2000, Rock began going to Dr. Hyeth for chiropractic treatment and massage therapy.[10] (AR 548).

Rock testified that she experienced no overall improvement in her back condition until after she had back surgery. (AR 551).

C.    Medical Evidence Introduced After 2004 Hearing

At the May 18, 2006 hearing, the ALJ said: "We've also added to the exhibit file since the last hearing Exhibit 5A, 10 through 15B, 3D and 4D, 10E through 16E, and 21F and 42F[11]. ... [These] Exhibits ... [have been] received into evidence and made part of the record." (AR 564).

1.    Written Statement and Opinion of Dr. Michael McCabe, M.D., Orthopedic Surgeon, Treating Physician and Non-Examining Medical Source Opinion

Dr. Michael McCabe performed lumbar surgery on Rock in January of 2002. He had begun to treat Rock for her back condition in August 2001. In a written report prepared by Dr. McCabe dated December 30, 2004 and received into evidence at the 2006 hearing as Exhibit 21F, pp. 2-3, Dr. McCabe stated:

> ... It is my understanding that a question has developed regarding [Ms. Rock's] physical capacity and ability to perform gainful employment in the time frame of 1996 to 1999, and then between 1999 and when I first examined her regarding low back and lower extremity complaints on 8/22/01, and then when she ultimately underwent extensive low back surgery on 1/28/02. [¶] I initially evaluated Ms. Rock on 8/22/01. At that time, she had a five to six year history of progressive back and leg pain symptoms on the left side with numbness and weakness. At that time, Ms. Rock reported that all light activities, including sitting, standing, walking, bending forward or back at the waist, coughing and sneezing aggravated her pain symptoms. [¶] Physical examination at that time

---

[10] Medical treatment records from Mesa Chiropractic begin on a date that appears to be in December of 2000. (AR 371, 373, 378.)

[11] The reference to "42F" appears to be wrong; the correct description is Exhibit 22F (see AR 7-8).

demonstrated left lower extremity ankle dorsiflexion weakness and extensor hallucis longus.  Range of motion of the low back was severe restricted in forward flexion by provocation of low back pain.  She had a notable degree of thoracolumbar kyphosis spinal deformity. [Dr. McCabe then describes the evaluations, diagnoses, opinions, and treatments for Rock's back-related condition during interim years, beginning in 1996 with Dr. Head, then Dr. Swanson in 1998, the MRI of Rock's spine done in September 2001 with resulting findings, and he concludes with the status of her back condition in January of 2002 when he performed back surgery to correct the condition, i.e., a 'lumbar laminectomy from L2 through L5, and bilateral posterolateral fusion with pedicle screws and rods at L4.'] [¶]  Based on the foregoing, it is my medical opinion that, on a much more probable than not basis, Ms. Rock was incapacitated from gainful employment in 1994, when she last worked, throughout the period of time up to her low back surgery in 01/02. [¶]  There is virtually no medical likelihood that she would have improved to a point of being able to return to gainful employment between the 1996 and 9/99 time frame. [¶]  It is clear from the medical records that her back pain symptoms worsened between 1999 and her low back surgery in 01/02 where she requested and then submitted to extensive low back surgery.  [¶]  In all the historical information Ms. Rock has provided to me, her history has been consistent and progressive with regard to back and leg pain and numbness symptoms up to the date of the 2020 surgery.  Her condition has been one of a progressive nature in terms of disc degeneration and spondylotic lumbar spinal stenosis, both structurally as well as, by her report, symptomatically, necessitating the aforementioned surgery.  [¶]  There is no likelihood whatsoever that she would have improved to the point of being employable at any level that required even light activities, including sitting, standing, and walking, between the 1996 and 1999 time frame, or between the 1999 and 2002 time frame.

(AR 478-479).

    2.    <u>Written Statement and Opinion of Dr. Craig E. Swanson, M.D., Internist, Treating Physician</u>

Dr. Craig Swanson prepared a written statement and opinion dated August 24, 2004, which was admitted into evidence at the May 2006 hearing.  (Exhibit 21F, pp.4-5/AR 480-481).  Dr. Swanson advised that he treated Rock from December 1998 through April 2000, and March 23, 2009 stated:

During the time I cared for her, she progressively worsened.  Initially she had chronic low back pain with bilateral sciatica (left greater than right), bilateral positive straight leg raising with crossover indicating nerve entrapment.  She had physical evidence of osteoarthritis and peroneal lumbar lordosis.  She was struggling to avoid surgery and the use of narcotics.  I attempted to halt her progression with a combination of non-steroidal anti-inflammatory medications, physical therapy and a home program of directed exercise to strengthen her back and relieve pressure on her discs.  [¶]  In reviewing Dr. Head's notes (which I did not have available when I treated her), his findings parallel mine.  Dr. Head found chronic low back pain, sciatica greater left with left leg and foot pain and

11

paresthesia[12]. At that time (1996) Ms. Rock had lumbar lordosis, L5 triangulation and osteoarthritis findings on x-ray. [¶] Dr. Head describes her difficulty standing and walking and inability to complete tasks of daily living. During the time I cared for Ms. Rock, she ... could not work a 40-hour per week job. She could not walk a block ..., stand and prepare meals, nor vacuum and clean the house, nor do her laundry unassisted. ... At any type of employment whether sitting or standing she would have had to take an inordinate number of breaks to lie down and get relief because that is what she had to do to get some relief at home. [¶] Therefore, Ms. Rock met the criteria for disability in November 1996 and on through April 2000 and on to surgery. In fact it is unfortunate she was not convinced to have surgery back in 1996. The physical findings of left leg motor radiculopathy that led to her surgery by [Dr.] McCabe in October 2001[13] were present in 1996.

(AR 480-481).

3. Written Statement and Opinion of Joseph Jensen, M.D., Board-Certified Orthopedic Surgeon, Non-Examining, Non-Treating Physician

Dr. Joseph Jensen, a non-examining consultative medical expert, was retained as part of the administrative adjudication process to provide opinion evidence on pending disability issues. Dr. Jensen was asked to review the medical evidence in the case record and to answer interrogatories posed by ALJ Ross. In his written statement dated August 22, 2005, Dr. Jensen advised that he had reviewed the medical data pertaining to Rock for the period in question, i.e., November 20, 1996 to December 31, 1999. (AR 517-519). He reported that there was sufficient objective medical evidence to allow him to form an opinion of the claimant's medical status during this period of time. (*Id.*) When asked to list Rock's physical impairments resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques for the period in question, Dr. Jensen identified "marked lumbar lordosis/thoracic kyphosis with mild scoliosis, some left lower extr[emity] radicular pain but no radiculopathy. Very weak abd[ominal] muscles improved with physical therapy [for six months in 1997]. Treating ortho[pedist], K. Head, ... provides most of the objective evidence in [Exhibit 1F at pages 1 and 3]." (*Id.*) Dr. Jensen also stated that the records disclosed "no evidence of significant

_____

[12] Dictionary of Medical Terms, Fifth Edition, Rothenberg and Chapman, Barron's Educational Series, (New York, 2006) defines paresthesia as "sensation (e.g., tingling or pins and needles); usually associated with partial damage to a peripheral nerve." (At p. 437.)

[13] Surgical lumbar fusion occurred in January 2002. (AR 422.)

disc path[ology]" during the period in question. (*Id.*) From his review of these medical records, Dr. Jensen opined that Rock's back pain during this period would have been "mild/moderate and intermittent, aggravated by prolonged standing and physical activity. [It] was helped by exercises, over the counter analgesics, and Darvocet N360." (*Id.*) Dr. Jensen also opined as to Rock's exertional capabilities during period in question in light of the physical impairments he had noted. Dr. Jensen concluded that Rock would be able to lift and carry twenty (20) pounds occasionally and, frequently, ten (10) pounds; to stand [and] walk for two (2) hours; and to sit for six (6) hours over the course of eight (8) hours as long as she had an opportunity every sixty (60) minutes to sit or stand for five (5) minutes. It appears from Dr. Jensen's statements that he also concluded that, given Rock's physical impairments during the period in question, she would be able, occasionally, to climb stairs and ramps, bend, balance, kneel, stoop, and crawl. (*Id.*)

D.    ALJ'S Analysis and Findings After 2006 Hearing

The following portions of the ALJ's decision are relevant to the issues under review.

The ALJ found that "[t]hrough the date last insured, the claimant had the following severe impairments: hypertension and low back pain." (AR 20.) In his fourth finding, the ALJ concluded that "[t]hrough the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526)." (*Id.*) In his discussion of that finding, the ALJ states:

> The claimant's spinal impairments do not meet or medically equal the criteria of section 1.04 in the Listing of Impairments. The claimant has provided no evidence of nerve root compression characterized by neuro-anatomic distribution of pain [pain radiating down her left leg], limitation of motion of the spine [inability to stoop, bend], motor loss (muscle weakness or atrophy with associated muscle weakness) accompanied by sensory or reflex loss [difficulties in walking/standing/ sitting, with numbness], and positive straight-leg raising test results in both the sitting and supine positions. There is no objective evidence of arachnoiditis. There is no objective medical evidence of spinal stenosis resulting in pseudoclaudication manifested by chronic nonradicular pain and weakness and resulting in inability to ambulate effectively.

(AR 22.)

The ALJ's fifth finding addressed Rock's residual functional capacity on the last date she was insured under the Act. Here, the ALJ stated that "[a]fter careful consideration of the entire record,

13

I find that, through the date last insured, the claimant had the residual functional capacity to perform a wide range of light work ....  In making this finding, I considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSRs 96-4p and 96-7p. I also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and SSRs 96-2p, 96-5p and 96-6p." (*Id.* at pp. 22-23.)

In discussing the basis for the residual functional capacity finding, the ALJ's analysis covered two areas – the medical opinions of several physicians and limited information about Rock's descriptions of her symptoms.  ALJ Ross considered the medical opinion evidence of Dr. Swanson, Dr. McCabe, Dr. Sonia Sawal[14], Dr. Eli Shirazy[15], and the consultative examiner, Dr. Jensen.  The ALJ did not discuss the statements or findings of Dr. Kenneth Head, a licensed medical doctor who treated Rock for problems stemming from her back condition during the period in question.  (AR 22-26).

As discussed above, Dr. Swanson was another of Rock's treating physicians who provided care to Rock for back-related problems during the period in question.  The ALJ considered his opinion but discounted it heavily, giving Dr. Swanson's information and conclusions little evidentiary weight.  (AR 23).  The ALJ did so, in large part, because Dr. Swanson saw Rock on two occasions from December 1998 through April of 2000; the doctor's treatment notes were "very sparse" with respect to any objective observations of Rock on those occasions when Dr. Swanson did treat Rock; and Dr. Swanson's opinions were inconsistent with the objective medical opinions of those other medical sources whose assessments the ALJ found were more consistent with the record as a whole.  (AR 23-24.)  The ALJ also discounted the opinion of Drs. McCabe and Sawal, saying that the objective medical evidence in the record established that the extent of symptoms and limitations Rock had in 2001 and later – the time frames when Drs. McCabe and Sawal treated Rock

---

[14] Dr. Sawal, a licensed medical doctor, treated Rock on or after June, 2001 for various physical health problems, including Rock's back condition.

[15] Dr. Shirazy was a licensed medical doctor who conducted a comprehensive orthopedic examination of Rock in July of 2003 for use in adjudicating Rock's Social Security disability claim.

1   – were not present on or before December 31, 1999.  (AR 24.)

2       ALJ Ross also discussed the opinions of the State disability orthopedic consultative examiner

3   and the orthopedic consultative non-examining expert Dr. Jensen in his fifth finding, stating:

4           The medical expert, Dr. Jensen, determined the claimant remained capable
            of performing a range of light work activity for the period on and before
5           December 31, 1999 ... .  This is consistent with the opinion and findings of
            the orthopedic consultative examiner [dated July 26, 2003].  This is also
6           consistent with the objective medical evidence in the record as a whole
            that establishes the claimant's condition deteriorated in 2001, but that her
7           limitations were relatively stable on and before December 31, 1999.  [¶]  I
            adopt the opinion of Dr. Jensen on the issue of the claimant's residual
8           functional capacity in existence on and before December 31, 1999.

9   (AR 25-26).

10      At the end of his analysis of the medical opinion evidence, the ALJ turned to a discussion of

11  Rock's subjective evidence of pain and other symptoms which she claimed was produced by her

12  back condition and impaired her functional abilities.  On this subject, the ALJ said:

13          In 2001, the claimant provided information in a number of forms that were
            completed when she applied for disability benefits.  The statements she
14          made about her symptoms generally refer to her current symptoms in 2001
            after she had experienced a worsening of her low back pain symptoms and
15          had developed some symptoms from systemic lupus erythematosus.  As
            such, her statements are of little help in determining the extent of her
16          limitations in existence on or before December 31, 1999.  Therefore, I give
            her statements little evidentiary weight on the issue of her residual
17          functional capacity in existence on and before December 31, 1999 (20
            CFR 404.1527; SSR 96-7p.)
18
    (AR 26).  Nothing more in the ALJ's decision can be fairly characterized as a discussion of the
19
    credibility of, or weight to be given to, Rock's subjective complaints evaluated through the lens of
20
    the disability regulations pertaining to evaluation of symptoms (20 CFR 404.1529) and Social
21
    Security Ruling No. 96-7p.
22
                                      **DISCUSSION**
23
24      The Appeals Council's March 15, 2006 remand order concluded that the ALJ had not

25  adequately considered a number of factors in evaluating the intensity, persistence, and limiting

26  effects of Rock's claimed symptoms and it clearly instructed the ALJ to address more thoroughly

27  Rock's subjective evidence of pain and other functionally limiting symptoms when reaching a

28  conclusion regarding Rock's disability.  Specifically, the remand order directed the ALJ to (1) further

evaluate Rock's subjective complaints and (2) provide a rationale for his assessment that accorded with the disability regulations as outlined in 20 C.F.R. § 404.1529 and with the policy and guidelines contained in SSR N. 96-7p. The ALJ did not comply with the remand order.

A.     20 C.F.R. § 404.1529

Section 404.1529(a) assures claimants that, when determining whether they are disabled, the Commissioner will consider all their symptoms, including pain, and the extent to which those symptoms are consistent with the objective medical evidence and other evidence in the case record. "Objective medical evidence" includes medical signs, i.e., anatomical, physiological, or psychological abnormalities which can be observed and which are shown by medically acceptable clinical diagnostic techniques. (20 C.F.R. § 404.1528(b).) "Objective medical evidence" also includes laboratory findings – anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques. (20 C.F.R. § 404.1528(c).)

Section 404.1529(a) assures claimants that, in evaluating disability, the Commissioner will consider all of their statements about their symptoms, such as pain, and any description the claimant, the claimant's treatment providers, and/or others may offer about how the claimant's symptoms affect their ability to engage in the normal activities of daily living as well as their ability to work. Section 404.1529(a) cautions claimants that their descriptions of the symptoms they experience will not be sufficient, by themselves, to establish disability under the Act; there will have to be medical signs and laboratory findings that show the claimant has a medically determinable impairment or combinations of impairments that could reasonably be expected to produce the symptoms claimants say they have experienced. If such a medically determinable impairment is found to exist, the regulation requires the Commissioner to evaluate the intensity and persistence of the claimant's symptoms in order to determine how those symptoms limit the claimant's capacity for work. (20 C.F.R. § 404.1529(c).) As part of this evaluation, the Commissioner must consider all of the available evidence, including but not limited, to objective medical evidence. And while the Commissioner must consider objective medical evidence from whatever medical source in evaluating the intensity and persistence of a claimant's symptoms and the extent to which those

symptoms limit the ability to work, the regulations also provide that the Commissioner will not reject

a claimant's statements about the intensity and persistence of their symptoms, or the effects those

symptoms have on the claimant's ability to work, solely because the available objective medical

evidence does not substantiate the claimant's statements.  (20 C.F.R. § 404.1529(c)(3).)

Section 404.1529(c)(3) also states:

> Since symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, [the Commissioner] will carefully consider any other information you may submit about your symptoms. ... Factors relevant to your symptoms ... which we will consider include:
> (i) Your daily activities;
> (ii) The location, duration, frequency, and intensity of your pain or other symptoms;
> (iii) Precipitating and aggravating factors
> (iv) The type, dosage, effectiveness, and side effects of medication you take or have taken to alleviate your pain or other symptoms;
> (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
> (vi) Any measures you use or have used to relieve your pain or other symptoms; and
> (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3).

The regulations do not allow the Commissioner to short-circuit the determination process: "In

determining the extent to which your symptoms, such as pain, affect your capacity to perform basic

work activities, we consider all of the available evidence described [above]." (20 C.F.R. §

404.1520(c)(4).)

B.    Social Security Ruling No. 96-7(b)

Social Security Ruling No. 96-7p explains the mandates of 20 C.F.R. § 404.1529 in more

depth.  Its purpose is "to clarify when the evaluation of symptoms ... under 20 CFR 404.1529 ...

requires a finding about the credibility of an individual's statements about pain or other symptom(s)

and its functional effects; to explain the factors to be considered in assessing the credibility of the

individual's statements about symptoms; and to state the importance of explaining the reasons for the

finding about the credibility of the individual's statements in the disability determination."   Among

other things, SSR No. 96-7p emphasizes that:

///

It is not sufficient for the adjudicator to make a single, conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

...

...

When additional information is needed to assess the credibility of the individual's statements about symptoms and their effects, the adjudicator must make every reasonable effort to obtain available information that could shed light on the credibility of the individual's statements.

SSR No. 96-79 at **3-4, 7.

C.   Applicable Case Law

1.   The Two-Step Analysis

The credibility of a claimant's subjective testimony regarding his or her pain and limitations may not be discounted without providing adequate reasons. *Bunnell v. Sullivan*, 947 F. 2d 341, 345-346 (9th Cir. 1991). At the administrative level, this involves a two-step analysis. *Smolen v. Chater*, 80 F. 3d 1273, 1281-1282 (9th Cir. 1996). If the claimant produces objective medical evidence of an impairment and shows that the impairment could reasonably be expected to produce some degree of symptom, and if there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of his or her symptoms "only by offering specific, clear, and convincing reasons for doing so." *Id.* at pp. 1281, 1282. Such specificity is crucial for effective judicial review. "The lack of specific, clear, and convincing reasons why Plaintiff's testimony is not credible renders it impossible for [the] Court to determine whether the ALJ's conclusion is supported by substantial evidence." *Mersman v. Halter*, 161 F.Supp.2d 1078, 1086 (N.D. Cal. 2001); *see also* SSR No. 96-7p (the ALJ's decision "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's

statements and reasons for that weight").[16]

"When the decision of an ALJ rests on a negative credibility evaluation, the ALJ must make findings on the record and must support those findings by pointing to substantial evidence in the record. [Citations omitted.] This rule is simply a specific application of a bedrock principle of administrative law. A reviewing court can evaluate an agency's decision only on the grounds articulated by the agency. [Citation omitted.]" *Ceguerra v. Secretary of Health & Human Services,* 933 F.2d 735, 738 (9th Cir. 1991). If the ALJ rejects that evidence, "[he or she] must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1996) (quoting *Varney v. Secretary of Health and Human Services*, 846 F.2d 581, 584 (9th Cir. 1988)).

2.      Pain Testimony

"Despite the inability to measure and describe it, pain can have real and severe debilitating effects; it is, without a doubt, capable of entirely precluding a claimant from working." *Fair v. Bowen*, 885 F.2d 597, 601 (9th Cir. 1989). It is possible to suffer disabling pain even where the degree of pain is unsupported by objective medical findings. *Id*. "In order to disbelieve a claim of excess pain, an ALJ must make specific findings justifying that decision" (citing *Magallanes v. Bowen*, 881 F.2d 747, 755 (9th Cir. 1989). *Id*. The findings must convincingly justify the ALJ's rejection of the plaintiff's excess pain testimony. *Id*. at p. 602. While an ALJ cannot be required to believe every allegation of disabling pain even where "the claimant introduces medical evidence showing that he has an ailment reasonably expected to produce some pain, (i*d*. at p. 603), once a claimant does produce medical evidence of an underlying impairment likely to cause the alleged pain, an ALJ may not discredit the allegations of the pain's severity solely because the evidence does

---

[16] Grounds for an adverse credibility finding include, but are not limited to, inconsistencies either in the claimant's testimony or between the claimant's testimony and conduct, the claimant's daily activities and work record, the location, duration, frequency, and intensity of the claimant's pain or other symptoms, testimony from physician's and third parties concerning the nature, severity, and effect of the symptoms of which the claimant complains, and the lack of adequate explanation of a claimant's failure to follow a prescribed course of treatment. *See Light v. Social Security Administration*, 119 F.3d 789, 792 (9th Cir. 1997); SSR No. 96-7p.

not support the applicant's claims. *Lester*, 81 F.3d at 834 (citing *Bunnell*, 947 F.2d 3at 343. .

D.     Failure to Comply with 20 C.F.R. § 404.1529(c) and S.S.R. No. 96-7p

Here, in evaluating the credibility of Rock's symptom testimony, the ALJ did not consider most, if not all, of the factors set forth in 20 C.F.R. § 404.1529(c)(3) and S.S.R. No. 96-7p; *see Smolen*, 80 F.3d at p. 1284, and *Bunnell,* 947 F.2d at p. 346.  Mindful of the decisional law that restricts a reviewing court's ability to make findings not otherwise contained in the administrative record (*see Ceguerra*, 933 F.2d at p. 738; *SEC v. Cheney Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575 (1947)), the transcript of these proceedings does not provide this Court with even the barest of discussions that might reasonably be said to fit within the contours of the case law and regulations outlined above.  The ALJ's decision characterized  Rock's back-related condition as severe.  (AR 20).   The ALJ's discussion of the severity of Rock's condition indicates that Rock's back problems emerged sometime prior to the disability period in question, and that on November 20, 1996, the date of claimed onset of disability, Rock was seen by Dr. Kenneth Head for treatment of her low back pain and radiating pain down her leg.  (AR 20, 134.)

Dr. Head's examination notes indicate that Rock reported having tingling and numbing in her foot as part of the constellation of symptoms related to her back pain.  (AR 134).  The ALJ's severity analysis acknowledges Dr. Head's notes that Rock had severe lumbar lordosis and dorsal kyphosis.  (AR 20).  At that time, Dr. Head observed Rock to lean so far backwards that her thorax was almost totally behind her sacrum.  (AR 134).  Lumbar spine x-rays taken around that time and used by Dr. Head in arriving at a diagnosis and treatment plan indicated a marked dorsal kyphosis at the L5-S1 disc space.  (AR 20).  Dr. Head diagnosed Rock with marked lumbar lordosis secondary to dorsal kyphosis and prescribed physical therapy as well as narcotic pain reliever Darvocet (N100) for her pain.  (AR 134).  The ALJ's discussion about the severity of Rock's back impairments further indicates that when Rock saw Dr. Head six months later, she had developed a slightly positive left-side straight leg raising response.  (AR 20).  She continued to have low back pain and Dr. Head continued to prescribe Darvocet (N100) for management of that pain and physical therapy to improve her trunk muscles.  (AR 21, 135).  The ALJ's severity of impairment analysis acknowledges that Rock consulted with Dr. Swanson in December of 1998 for low back pain, left

leg pain, and numbness, and that Dr. Swanson diagnosed Rock at that time with osteoarthritis, low

back pain, sciatica, and scoliosis and referred her to physical therapy.  (AR 21).  Dr. Swanson's

treatment notes, referred to by the ALJ in this portion of his discussion (*see* "Exhibit 3F, p. 3" at AR

21), also show that Dr. Swanson prescribed Voltaren, a non-steroidal anti-inflammatory drug, for

Rock's back condition.  (AR 152).

Dr. Jensen, the consultative orthopedic medical expert upon whose opinion ALJ Ross seems

to have relied heavily (AR 25, 26), also noted that Rock had mild to moderate pain during the period

in question relative to medically determinable physical impairments.  (AR 517, 518.)  Her pains

symptoms included back pain and radiating pain in the left leg.  (AR 517).  Dr. Jensen noted that

prolonged standing and physical activity aggravated Rock's pain during the period in question.  (AR

518).  He also reported that Rock's pain was managed through the use of medication, including

narcotic pain relievers. (*Id.*)

There is no dispute that Rock suffered from at least one medically determinable physical

impairment during the period in question, i.e., a spinal disorder or disorders, described variously as

lumbar lordosis, thoracic kyphosis, scoliosis, sciatica, and/or probable degenerative disc disease.

Similarly, no one appears to question the assumption that the medically determinable physical

impairment Rock suffered – an apparently severe spinal disorder – could reasonably be expected to

produce some degree of symptoms.[17]   Several symptoms Rock claimed to have experienced as the

result of this impairment are mentioned in the medical evidence reviewed and considered by the ALJ

in his decision.  Those symptoms included low back pain, which was aggravated by standing and

other physical activities (not otherwise specified), and pain radiating down Rock's left leg.  Other

symptoms described by Rock's treating physicians included numbness and tingling in Rock's left

extremity.  Dr. Jensen concludes from his record review that Rock's back pain registered in the mild

to moderate pain and was intermittent.  During the period in question, mitigating Rock's pain

_____

[17]  "The claimant need not produce objective medical evidence of the [symptom] itself, or the severity thereof.
Nor must the claimant produce objective medical evidence of the causal relationship between the medically determinable
impairment and the symptom.  By requiring that the medical impairment could reasonably be expected to produce pain or
another symptom, the *Cotton* test requires only that the causal relationship be a reasonable inference, not a medically
proven phenomenon.  'We have never required that the medical evidence identify an impairment that would make the
pain inevitable.' [Citations and most internal quotations omitted.] " *Smolen*, 80 F.3d at p. 1282.

necessitated the use of narcotic pain relievers as well as other less potent drugs, non-steroidal anti-inflammatory medication and a regimen of physical therapy that extended over the course of at least six months.  The degree to which these measures were successful in alleviating Rock's symptoms and improving her functional capacities is absent from the ALJ's analysis.

Also missing from the ALJ's analysis is any evaluation of the impacts this medically determinable impairment had on Rock's daily activities, her ability to work, her quality of life, or any of the other factors outlined in 20 C.F.R. § 404.1529(c) and SSR No. 96-7p.  At earlier hearings, Rock provided evidence of her symptoms and functional limitations during the relevant period. Rock's subjective experiences are also detailed in many of the medical records generated during the period of claimed disability.  Later medical records incorporated that earlier information. Medication regimens are described and physical therapy records are provided.  Patient cooperation and participation is reported.  However, the ALJ's decision does not mention any testimony Rock gave about her claimed disability and its symptoms – its onset, its progression, the treatment she sought and the efforts she made to address the problems, what made it worse and what made it better, the ways in which her daily life was affected by her health problems, and what other accommodations she felt compelled to make her activities because of her health conditions.  The ALJ's failure to address this  evidence is contrary to 20 C.F.R. § 404.1529(c)(1)-(4).

Because the ALJ failed to assess Rock's testimony regarding her claimed disability and its symptoms, there is no useful credibility analysis of those symptoms and their functional limitations in the ALJ's decision.  It is not enough to say, as the ALJ did in this case, that Rock's 2001 statements about her symptoms:

> generally referred to her current symptoms in 2001 after she had experienced a worsening of her back pain symptoms and had developed some symptoms from systemic lupus erythematosus.  As such, her statements are of little help in determining her limitations in existence on and before December 31, 1999.  Therefore, I give her statements little evidentiary weight on the issue of her RFC in existence on and before December 31, 1999.

///

///

///

22

Not only is the ALJ's conclusion inconsistent with ALJ Lyons' earlier finding that Rock experienced credible and significant pain throughout the period in question,[18] it ignores the testimony that Rock provided at the first and second hearings about her pain and the limitations imposed by that pain on her functional abilities during the period in question. It also overlooks the descriptions of Rock's reported symptoms that were included in the various medical records generated during the period in question, e.g., pain, numbness, functional motor limitations as well as other functional restrictions in the conduct of her daily living activities.

Moreover, even if the Court were to credit the claimed absence of relevant evidence about Rock's symptoms and functional limitations from November 1996 through December 31, 1999, the Court cannot overlook that the absence of such evidence highlights the ALJ's failure to develop the record more fully. That duty is not only found in the regulations themselves (*see* SSR No. 96-7p – "when additional information is needed to assess the credibility of the individual's statements about symptoms and their effects, the adjudicator must make every reasonable effort to obtain available information that could shed light on the credibility of the individual's statements"), it is reflected in the decisional law of the Ninth Circuit. The administrative law judge "has a duty to develop the record ... even when the claimant is represented by counsel." *DeLorme v. Sullivan*, 924 F.2d 841, 859 (9th Cir. 1991). When the claimant is not represented by counsel, "it is incumbent upon the ALJ to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts." *Higbee v. Sullivan*, 975 F.2d 558, 561 (9th Cir. 1992) (per curiam) [citation omitted].

E.    Inadequate Credibility Assessment

The ALJ's evaluation and discussion of the credibility of, and weight to be assigned to, Rock's symptoms and limitations in his most recent decision is inadequate. In his decision, the ALJ states that he reached his conclusion about Rock's disability states:

"[a]fter careful consideration of all the evidence" (AR 18) and that "[i]n making this finding [regarding Rocks' residual functional capacity], I considered all

---

[18]    As mentioned earlier, an item of evidence before ALJ Ross at this hearing (Exhibit 16E at p.3) states, in part, that "[I]t should be noted that Judge Lyons stated at the first hearing that she [claimant] has 'credible testimony throughout the time frame' and that he would make a note of that to the ME when he sent out his interrogatories." (AR 476). The referenced "time frame" appears to cover sometime in 1996 through December 31, 1999. (AR 537-538.)

symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSRs 96-4p and 96-7p. I also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and SSRs 96-2p, 96-5p and 96-6p." (AR 23.)

However, a review of the discussion following these assurances focuses sharply and almost exclusively on the various opinions of much of the objective medical evidence in this case. That discussion does not incorporate or evaluate much, if any, of Rock's subjective complaints and their credibility. It does not provide a comprehensive listing of Rock's symptoms and/or the limitations she claimed to experience as a result of her back-related condition during the period in question. Instead, the analysis is devoted to evaluating the weight to be given, and the deference to be shown, to the various opinions of several of the treating and/or consulting physicians involved in this case, and resolving the conflicting medical expert opinions. Although both are part of the decision-making process, the sifting of expert medical opinion in determining the weight to be given conflicting positions differs in substance from that involved in assessing the credibility of, and/or the weight to be assigned to a claimant's description of her symptoms and their functional impacts.

The ALJ's decision talks about, and evaluates the competing value of the various medical opinion in considerable and useful detail, but spends little time examining Rock's specific complaints and limitations as required by the regulations and case law. Under these circumstances, the ALJ's conclusory assurances that he has considered all the evidence and weighed it carefully according to the applicable regulations and Social Security Rulings, appears to be form over substance and does not comport with the requirements of SSR 96-7p – a ruling with which the ALJ was directed to comply by the Appeals Council's remand order, to wit:

It is not sufficient for the adjudicator to make a single, conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.' It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

///

///

Although the ALJ's conclusion explains that he assigned "little" weight to Rock's statements about her symptoms and disability on and before December 31, 1999, the Court is unable to conclude that there was substantial evidence in this record to support the ALJ's conclusion that her symptoms and limitations worsened in mid-2001 and, as such, "are of little help in determining the extent of her limitations in existence on and before December 31, 1999." (AR 26). The ALJ does not describe what Rock's symptoms and limitations were, or claimed to have been, during the period of claimed disability. With reference to the period in question, there is no mention of what symptoms the ALJ considered, when those symptoms emerged, the duration of the symptoms, what aggravated or lessened those symptoms or their impacts, the intensity of those symptoms, what Rock claimed her functional limitations were during the period in question as a result of anyone or more of these symptoms, what medication and other treatment she used to manage or mitigate those symptoms during this time frame, and/or the degree to which these efforts were successful in managing or arresting the symptoms of her impairment(s). This Court is left to speculate as to basis for the ALJ's credibility ruling, which it declines to do.

The ALJ's failure to evaluate Rock's subjective complaints and to provide a rationale for his evaluation that accorded with the disability regulations and rulings pertaining to evaluation of symptoms was error under both the provisions of the Social Security Administration's regulatory framework (*see* 20 C.F.R. § 404.977(b) – "[t]he administrative law judges shall take any action that is ordered by the Appeals Council and may take any additional action that is consistent with the Appeals Council's remand order") and the decisional law of the Ninth Circuit. The ALJ has provided this Court with insufficient explanations to enable it to assess whether his decision was based on the proper application of law and sufficient evidence. *Mersman*, 161 F.Supp. 2d at 1086; SSR No. 96-7p at **3-4.

F.     Conclusion

For the reasons set forth above, the Court concludes that there is no substantial evidence in this record to support the ALJ's conclusion on the ultimate issue of disability in light of the absence of specific, clear, and convincing reasons for assigning *de minimus* weight to the credibility of Rock's complaints about her back-related symptoms and their functional limitations. Based on the

25

foregoing, the Court also concludes that the ALJ failed to apply the proper legal standards in weighing the evidence and deciding to deny benefits.

G.   Remand

Rock requests that the Court vacate and set aside the ALJ's denial of benefits, find that Rock is disabled and award benefits.  However, as the Ninth Circuit explains:

> Remand for further administrative proceedings is appropriate if enhancement of the record would be useful.  Conversely, where the record has been developed fully and further administrative proceedings would serve no useful purpose, the district court should remand for an immediate award of benefits.  More specifically, the district court should credit evidence that was rejected during the administrative process and remand for an immediate award of benefits if (1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited. *Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004).

Rock urges the Court to credit Rock's subjective testimony as true in light of the insufficiency of the rationale for its rejection, relying on the decision in *Varney v. Secretary of Health and Human Services*, 859 F.2d 1396 (9th Cir. 1988).  The "crediting as true" doctrine is not mandatory; rather, there is flexibility in applying that approach.  *See Connett v. Barnhart*, 340 F.3d 871, 876 (9th Cir. 2003).  While ALJ Ross erred in his treatment of Rock's subjective complaints of symptoms and limitations, it is not clear from this record that ALJ Ross would have found Rock disabled were such evidence more carefully considered and appropriately analyzed.  Accordingly, Rock's credibility on the issue of her symptoms and their functional impacts during the period in question should be appropriately evaluated and analyzed on remand.  It may well be necessary for the ALJ to take further testimony from Rock and others on this and related issues.

## ORDER

Based on the foregoing, the Court finds that the ALJ's decision is not supported by substantial evidence and is not free of legal error.  Therefore, the Court orders that:

1.  Plaintiff's social security complaint, Doc. 7, IS GRANTED;

2.  This matter IS REMANDED pursuant to sentence four of 42 U.S.C. § 405(g) for proceedings as delineated in this opinion; and

26

1      3.  The Clerk of Court is DIRECTED to ENTER JUDGMENT for Plaintiff Marlene Rock

2  and against Defendant Michael J. Astrue, and to close this file.

3

4  IT IS SO ORDERED.

5  Dated:   **March 23, 2009**                                **/s/ Theresa A. Goldner**
                                                              UNITED STATES MAGISTRATE JUDGE

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28